NOT DESIGNATED FOR PUBLICATION

No. 120,627

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

AMANDA KRISTIN HENLEY,
*Appellant*.

MEMORANDUM OPINION

Appeal from Douglas District Court; JAMES R. MCCABRIA, judge. Opinion filed October 30, 2020. Affirmed.

*Kai Tate Mann*, of Kansas Appellate Defender Office, for appellant.

*Kate Duncan Butler*, assistant district attorney, *Charles E. Branson*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before GREEN, P.J., STANDRIDGE, J., and MCANANY, S.J.

PER CURIAM: In this appeal we consider the sufficiency of the evidence used to convict Amanda Henley of interfering with a law enforcement officer, specifically officer Brian Wonderly of the Lawrence Police Department, in the performance of his official duty. Amanda was also charged with other crimes, but she was acquitted of these other charges at trial. The police interference charge arose out of an incident in which the police came to Amanda's home to search for her son who was suspected of being involved in a burglary and an aggravated assault earlier that day. The State contended that Amanda knowingly resisted Officer Wonderly in his effort to secure the house so the police could search for her son.

1

In Amanda's opening statement at trial her counsel stated:

"[W]hat you will hear and what you will mainly hear and not see is that my client, as opposed to wanting to hide her son from the police, simply did not want to be patted down. The evidence will be that she was in a bikini. She had a shirt on, but she was in a bikini bottoms.

"She felt particularly vulnerable, and there were approximately six to eight officers there, basically manhandling her. You will hear her screaming. You will hear some curse words from her. That is not her attempt to hide her son from them. It is her attempt to have them not touch her in ways that she felt were insulting to her."

At trial Officer Wonderly was the State's primary witness on the police interference charge. Amanda did not testify. The following facts were developed during the trial testimony.

On the afternoon and evening of July 13, 2018, the Lawrence police were looking for Ross Henley, Amanda's son, whom they believed had been involved in a burglary and an aggravated assault earlier that day. At 8 p.m., two officers went to a residence in Lawrence where they believed Ross could be found in order to execute an arrest warrant. When they knocked on the door, Amanda answered the door and told the officers that Ross was not there. Officer Wonderly was not one of the officers. His shift did not start until 8:30 that evening.

The officers left and returned to the police station. They determined that the house was owned by Ross' grandmother, Elizabeth Henley, so they called her, and she agreed to meet the officers at the house and let them in so they could search for Ross.

Approximately five officers went to the house at about 9 p.m. where Elizabeth, the owner, met them. Officer Wonderly met the other officers at the house about 5 to 10 minutes before Elizabeth arrived. After the officers explained to Elizabeth what was

2

about to happen, she knocked on the door and told Amanda to open the door. Elizabeth explained:

> "[Amanda] looked behind me and stepped back, and then there were several people saying, 'Get out of the way. Get out of the way.' So I saw a policeman stepping forward. I saw Amanda moving backwards, and then I was getting out of the way, and then it was very chaotic."

Officer Wonderly ordered Amanda to step outside while the officers conducted their search. Amanda initially refused to come out. After telling her to come out of the house five or six times, she complied and stepped out of the house onto the porch.

The officers were concerned that Ross might be armed with a gun. Officer Wonderly testified to their standard procedure in this type of situation: "[A]nybody we came in contact with, we would get 'em outside, make sure they didn't have any weapons or anything that could harm us or themselves, and then we would detain them while we finished the search."

Amanda was wearing a long T-shirt over a bikini bottom. There were no pockets in either of these items of her clothing. There were no female officers present that evening to conduct a pat-down of Amanda, particularly given her state of attire. When Officer Wonderly told Amanda that he was going to pat her down for any weapons, she began swinging her arms around and yelling, "Don't touch me." She did not give a reason for not wanting Wonderly to pat her down. She did not tell Officer Wonderly that she did not want him to go into the house, and Wonderly had no reason to believe that by her actions Amanda was trying to prevent him from going into the house. Wonderly and another officer tried to grab Amanda's arms to detain her. The officers were able to place Amanda in handcuffs. At that point, other officers took custody of Amanda while Officer Wonderly returned to the front door of the house. The officers who took custody of Amanda eventually patted her down but found no weapons. All of this took place on the

3

front porch while the door to the house was standing open. Officer Wonderly and two other officers then entered the house where they found and arrested Ross, who was hiding in the attic.

Wonderly estimated that Amanda's actions caused a two- to three-minute delay before he could start the search. When asked at trial whether Amanda's actions substantially hindered his ability to secure the residence, Wonderly stated, "Somewhat, yeah." He stated:

> "Because it delayed the action. Especially when there is firearms involved, we want to get scenes secure as soon as we can. Standing on the front porch is not the best place when there is potentially somebody inside with a firearm. Especially right in front of a doorway, because doorways are bad places to be when you're dealing with someone with a firearm, because it's an easy box to see your target through, so it's just putting us in a very dangerous situation."

The jury was instructed that the State was required to prove the following beyond a reasonable doubt in order to convict Amanda of this charge:

> "1. Brian Wonderly was discharging an official duty, namely secure the residence for officer safety.
> "2. The defendant knowingly resisted Brian Wonderly in discharging that official duty.
> "3. The act of the defendant substantially hindered or increased the burden of the officer in the performance of the officer's official duty.
> "4. At the time the defendant knew or should have known that Brian Wonderly was a law enforcement officer.
> "5. This act occurred on or about the 13th day of July, 2018 in Douglas County, Kansas."

4

With respect to the element of knowingly resisting, the court instructed the jury: "The State must prove that the defendant committed the crime knowingly. A defendant acts knowingly when the defendant is aware of the nature of her conduct that the State complains about."

In his closing argument Amanda's counsel argued that Amanda's actions were not "premeditated in order to prevent Officer Wonderly and his colleagues to enter the house to find her son." He argued that Amanda "wasn't trying to prevent Officer Wonderly from going into the house. . . . All she wanted was not to be touched. That's all she wanted. She was in a bikini bottom. She was in a T-shirt." He also argued that "the delay of two to three minutes . . . is not a substantial delay, or substantial increase of the burden that the officer had."

Amanda was convicted at trial on this charge, and she was sentenced to seven months' imprisonment. This appeal followed.

*Discussion*

Whether the State provided sufficient evidence to convict Amanda of this charge is a rather close call. Amanda challenges the sufficiency of the evidence presented at trial to convict her. She does not challenge the court's jury instructions. Her only assertion is that the two- to three-minute delay that Officer Wonderly testified to was of too short a duration to substantially hinder Officer Wonderly in his effort to clear the house of occupants before searching for Ross.

In our consideration of this argument we view the evidence in the light favoring the State, the prevailing party, to determine if a rational fact-finder could find Amanda guilty beyond a reasonable doubt based upon that evidence. In doing so we do not

5

reweight the evidence or determine the credibility of the witnesses. Those were matters for the jury. See *State v. Brown*, 305 Kan. 674, 689, 387 P.3d 835 (2017).

K.S.A. 2019 Supp. 21-5904(a)(3) defines interference with law enforcement as "knowingly obstructing, resisting or opposing any person authorized by law to serve process in the service or execution or in the attempt to serve or execute any writ, warrant, process or order of a court, or in the discharge of any official duty."

Citing *State v. Parker*, 236 Kan. 353, Syl. ¶ 5, 690 P.2d 1353 (1984), the State points out that our Supreme Court added an element of the crime not found in the statute—"that the act of the defendant substantially hindered or increased the burden of the officer in carrying out his official duty." The State further points out that our Supreme Court has in recent years declined to read words into statutes not placed there by the Legislature. Thus, the State urges us to reject this "substantially hindered" language in determining whether the evidence here was sufficient to support Amanda's conviction.

But since *Parker*, our appellate courts have consistently applied this "substantially hindered" language in cases of interference with an officer's official duties. We are duty bound to apply the language found in *Parker* absent an indication that our Supreme Court no longer approves of this language. See *State v. Rodriguez*, 305 Kan. 1139, 1144, 390 P.3d 903 (2017). Most recently in the Supreme Court's decision in *Brown*, the court cited *Parker* with approval for the proposition that "[t]he defendant's act 'must have substantially hindered or increased the burden of the officer in carrying out his official duty.'" 305 Kan. at 690. Thus, we will adhere to the holding in *Parker* in deciding whether substantial evidence supports Amanda's conviction.

In *Brown,* the defendant was hiding in the basement and refused to come out when the police, standing at the top of the stairs, ordered him to do so. The police then went into the basement, and one of the officers radioed for a K-9 unit while the other officer

6

looked around. "When an officer moved a piece of clothing, Brown announced he was there and would cooperate, and he emerged from behind a ledge." 305 Kan. at 689. The officers were in the basement a total of 5 to 10 minutes. Brown surrendered before the K-9 unit arrived.

Our Supreme Court found that this created for both the defendant and the police an immediate safety issue that required the officers to take additional actions to deal with their security concerns. 305 Kan. at 689. The court noted that the principal purpose of criminalizing the obstruction of an officer's duty is to ensure safety:

> "'The principal purpose of criminalizing conduct that resists and obstructs officers in the performance of their duty is to protect officers from physical harm. . . . The statutes de-escalate the potential for violence which exists whenever a police officer encounters an individual in the line of duty, and the concern is not limited to the officer's safety but extends to all parties involved, including the prospective arrestee.' 67 C.J.S., Obstructing Justice § 25." 305 Kan. at 690.

A contrary outcome was obtained in *State v. Everest*, 45 Kan. App. 2d 923, 256 P.3d 890 (2011). There, the defendant driver was charged with interfering with an officer's drunk driving investigation by giving the officer a fake name. The investigating officer promptly remedied the defendant's false statement by walking to his car and checking the name with dispatch, all of which took only a few minutes. The court reversed Everest's conviction. 45 Kan. App. 2d at 930.

In *Everest*, the defendant's interference with the officer's investigation did not create or aggravate any safety concerns for the officer. In our present case, Officer Wonderly reasonably believed Ross was armed with a gun after allegedly committing violent crimes earlier that day. In order to move through the house safely, he needed to remove bystanders before the officers could search for Ross using a bullet-resistant shield for protection. This plan required the assistance of several officers. Wonderly testified

that he felt he was substantially hindered by Amanda's actions because she created a more dangerous situation.

Amanda's actions delayed Wonderly entering the house and heightened the intensity of an already potentially dangerous situation. When viewing the evidence in the light favoring the State, a rational juror could find that Amanda substantially hindered Wonderly in his effort to clear the residence so he could search for Ross—a potentially armed man—by ignoring orders to leave the house and by resisting his efforts to pat her down for weapons.

Affirmed.